# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CASE NO. 3:22-CR-083-FDW-DCK

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| v. ) | **MEMORANDUM AND RECOMMENDATION** |
| ) | |
| LIONEL TEASLEY, ) | |
| Defendant. ) | |

**THIS MATTER IS BEFORE THE COURT** on Defendant's "Motion To Suppress Evidence Based On Fourth Amendment Violations" (Document No. 15) filed November 14, 2022. The United States filed its "Response To Defendant's Motion To Suppress" (Document No. 19) on November 28, 2022. Defendant filed his "Reply To Government's Opposition To Motion To Suppress" (Document No. 20) on December 6, 2022. An evidentiary hearing was held before the undersigned on January 5, 2023, with Defendant personally present with counsel. This motion has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b), and immediate review is appropriate. Having carefully considered the briefs, testimony, and oral arguments, the undersigned will respectfully recommend that the motion be granted.

## I. PROCEDURAL HISTORY

On March 16, 2022, Defendant Lionel Teasley ("Defendant" or "Teasley") was indicted for one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). (Document No. 1). Defendant, through counsel, filed a "Motion To Suppress Evidence Based On Fourth Amendment Violations" (Document No. 15) on November 14, 2022, seeking to suppress certain Government evidence in the case. The Government's "Response To Defendant's Motion

To Suppress" (Document No. 19) was filed November 28, 2022. Defendant filed a "Reply To Government's Opposition To Motion To Suppress" (Document No. 20) on December 6, 2022. The Court noticed a hearing on the matter.

The motion came on for a hearing on January 5, 2023, at which time one witness was presented by the prosecution and cross-examined by the defense. The principal questions presented by the Defendant's motion are whether a law enforcement officer employed with the Mecklenburg County Alcohol & Beverage Commission had reasonable suspicion to stop Defendant's car, detain him, order him out of the car to perform a frisk of Defendant's person, search the car once Defendant revealed that there was a gun in the car, and then run a criminal history check through various databases to determine whether Defendant was a convicted felon. It was the search of the car that ultimately led to the seizure of the firearm and the subsequent criminal history check that together form the basis for the charge. In total, the traffic stop lasted approximately forty-six minutes. Given that the vast majority of the stop entailed the officer running a criminal history check on Defendant to determine whether he was a convicted felon, the undersigned's primary focus in the analysis that follows is whether the traffic stop was unconstitutionally prolonged in violation of the Fourth Amendment.

## II. FACTUAL SUMMARY

As noted, the Court conducted a hearing on this matter on January 5, 2023, at which the Government presented witness testimony and both the Government and Defendant presented argument. The Government presented the testimony of one law enforcement officer – Officer Stephen A. Smith of the Mecklenburg County Alcohol & Beverage Commission ("ABC"). Evidence also included cross-examination of the witness. Finally, the Government presented

video evidence from Officer Smith's body-worn camera ("BWC"). The defense referred to scenes from this video footage as well during the cross-examination of Officer Smith.

First, the Government began its direct examination of Officer Smith. Officer Smith has been employed with ABC since 2010. Prior to his current employment with ABC, Officer Smith was employed with the Charlotte-Mecklenburg Police Department from 2002 to 2010. Officer Smith further testified that he is a certified concealed carry handgun instructor. Pursuant to N.C. Gen. Stat. § 18B-501 and the Controlled Substances Act,[1] Officer Smith testified that ABC officers can investigate activity relating to or arrest an individual for violations of North Carolina criminal offenses.

In 2020, Officer Smith stated that many larcenies occurred at ABC stores. Following a larceny, the store manager ordinarily would send an email alert to ABC officers for investigatory purposes. On October 15, 2020, Officer Smith testified that he received one such email alert, indicating that a black female had taken a bottle of tequila from the ABC store on Wilkinson Boulevard without making a purchase. According to Officer Smith, two photos were included in the email alert – one of the female, and one of the suspect vehicle. Using the photograph of the suspect vehicle, a silver Honda sedan, Officer Smith testified that he was able to decipher the vehicle's license plate, PEH-4246.[2]

The following day, October 16, 2020, Officer Smith testified that he ran the vehicle's registration, learning that the car was registered to an address in Mint Hill, NC. Although not assigned to the case yet, Officer Smith took it upon himself to investigate the larceny and drove to

---

[1] ABC officers, by North Carolina statute, "may assist State and federal law-enforcement agencies in the investigation of criminal offenses in North Carolina." N.C. Gen. Stat. § 18B-501(e).

[2] Officer Smith testified at the hearing that he discovered later, on October 28, 2020, that the photograph sent in the email alert and from which he deciphered the plate that was registered to the Mint Hill address, was not the vehicle from which the misdemeanor larceny suspect departed the ABC store. See also (Document No. 19, p. 2, n.1).

3

Mint Hill, arriving at 3:22 p.m. on October 16. Following his arrival, he observed a 2019 silver Honda pull into the lot, and some time after he learned that the registration on the car was expired. Officer Smith testified that he could not see the driver because of the vehicle's window tint. A few short minutes later at 3:25 p.m., Officer Smith initiated a traffic stop on the roadway closest to the apartment complex parking lot where the car had pulled out. Officer Smith related that he asked the driver if he had any guns, upon which he observed both of the driver's arms extended outside of the driver side window when he got out of his own vehicle following the traffic stop. From his time as a concealed carry instructor, Officer Smith testified that he had learned and taught others that extending both arms outside of one's vehicle was an indication that there were weapons present in the car. Furthermore, Teasley apparently stated that he had a gun in the car upon Officer Smith's approach.

When Officer Smith asked Teasley if he had his ID, Teasley responded that he had left his ID in his residence. Officer Smith then asked Teasley to step out for a frisk, after which Officer Smith tried to locate the weapon because he testified that he was concerned for his safety. Officer Smith testified that while he was searching the car, Teasley remained outside the car unrestrained. The gun, according to Officer Smith, was not in plain view, and Officer Smith had to pull back the driver's seat cushion in order to retrieve it. According to Officer Smith, the gun had an extension and had a round in the chamber. Teasley, while admitting to the presence of the gun in the car, apparently did not indicate to Officer Smith whether he had a concealed carry permit.

Following retrieval of the gun from the car, Officer Smith then told Teasley that he "wasn't who [he] was looking for." The pair walked back towards Officer Smith's patrol vehicle so that Officer Smith could verify Teasley's criminal history in his system since Teasley failed to produce an ID. Due to computer processing delays, Officer Smith was not able to definitively determine

4

whether Teasley was a convicted felon for some time. In fact, Officer Smith called in the assistance of Mint Hill Police, who deployed an officer to the scene. At 4:07 p.m. (forty-two minutes after the traffic stop began at 3:25 p.m.), Officer Smith and the Mint Hill police officer determined after a call to dispatch that Teasley was a convicted felon. Four minutes later, at 4:11 p.m., Officer Smith arrested Teasley for possession of a firearm by a convicted felon. In total, therefore, the traffic stop lasted forty-six minutes. Not once did Officer Smith mention the expired registration.

On cross-examination, Defendant's counsel inquired about why Officer Smith, who did not personally observe the misdemeanor larceny of the tequila bottle from the ABC store and who was not assigned to investigate the case, decided to take it upon himself to investigate anyway. Defendant's counsel further inquired about why Officer Smith proceeded to drive to Mint Hill to the address where the vehicle from the email alert photo was registered when he was aware that the owners of the vehicle were of Asian ethnicity and the shoplifting suspect was a black female. Furthermore, Defendant's counsel pressed Officer Smith for an explanation as to why he continued to investigate the vehicle in Mint Hill when he saw a male get into the rear passenger seat despite not knowing who was driving the car and without any evidence that the larceny suspect was in the car on October 16, 2020.

Defendant's counsel spent significant time questioning Officer Smith on cross-examination about where he had learned that holding one's arms outstretched through the driver side window was a signal that one possessed weapons. Officer Smith seemed to concede that while he may not have learned the signal from any kind of written training material, he commonly taught others about the signal as a concealed carry instructor. He also indicated that he was sure

5

that he learned about the signal during his time as an officer with the Charlotte-Mecklenburg Police Department.

Officer Smith admitted on cross-examination that while he had his ticket pad with him on October 16, 2020 in Mint Hill, he never wrote Teasley a ticket for driving a vehicle with expired registration. Furthermore, Officer Smith explained that he called Mint Hill police because he did not have the proper credentials to verify Teasley's status as a felon.

### III. STANDARDS OF REVIEW

The Fourth Amendment guards the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Furthermore, "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure'" for Fourth Amendment purposes. Whren v. United States, 517 U.S. 806, 809 (1996). Additionally, traffic stops bear more resemblance to brief investigative stops than they do to arrests. Rodriguez v. United States, 575 U.S. 348, 354 (2015). For that reason, an officer's actions during a traffic stop are subject to the directive in Terry v. Ohio that they be "'reasonably related in scope' to the basis for the stop.'" United States v. Hill, 852 F.3d 377, 381 (4th Cir. 2017) (citing United States v. Williams, 808 F.3d 238, 245 (4th Cir. 2015)). A routine traffic stop becomes an unreasonable seizure," and therefore unconstitutional under the Fourth Amendment, "when law enforcement impermissibly exceeds the stop's scope or duration." United States v. Hill, 849 F.3d 195, 200 (4th Cir. 2017). A traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete [the] mission [of the traffic stop]." Illinois v. Caballes, 543 U.S. 405, 407 (2005). Thus, a traffic stop is reasonable and constitutional under the Fourth Amendment where the stop "last[s] no longer than is necessary to effectuate [the] purpose [of the stop]," which is to

"address[] the [traffic] infraction." Rodriguez, 575 U.S. at 354 (internal citations and quotations omitted). Thus, "[a]uthority for the seizure [] ends when tasks tied to the infraction are—or reasonably should have been—completed." Id.

The duration of the traffic stop therefore must equal no longer than the amount of time required to complete the ordinary tasks usually performed at traffic stops, tasks tied to the traffic infraction itself providing justification for the stop. Those tasks usually performed include: "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. at 355. "[E]nsuring that vehicles on the road are operated safely and responsibly" is the common theme that runs through each of the aforementioned tasks. Id.

Nonetheless, a traffic stop might not be *solely* composed of the performance of the aforementioned tasks. Indeed, "[t]he Fourth Amendment may tolerate certain unrelated investigations that do not lengthen the roadside detention." Id. at 349. However, any unrelated investigation "is permitted under the Fourth Amendment only as long as that activity does not prolong the roadside detention for the traffic infraction." United States v. Hill, 852 F.3d 377, 382 (4th Cir. 2017). There is a limited exception to the requirement that such investigations into unrelated criminal activity occur within the timeframe for completion of the traffic stop. To prolong a traffic stop past the time required to complete the ordinary tasks associated with a traffic stop, an officer needs "reasonable suspicion of criminal activity." Id.

## IV. DISCUSSION

The central issues presented by Defendant's "Motion To Suppress Evidence Based On Fourth Amendment Violations" (Document No. 15) are as follows: did law enforcement, notably an ABC officer investigating a misdemeanor larceny of a tequila bottle, have reasonable suspicion

7

to make a traffic stop of the car that Defendant was driving, order him out of the car and perform a frisk of Defendant's person, subsequently detain him, unrestrained, while performing a search of the passenger compartment of the vehicle, and finally run a criminal history check – all of which lasted approximately forty-six minutes? Importantly, the question that the undersigned must answer is whether the traffic stop of the vehicle Defendant was driving took too long under the Fourth Amendment. Ultimately, based on the analysis that follows, the undersigned will conclude that the traffic stop was unconstitutionally prolonged in violation of the Fourth Amendment.

The Defendant argued at the hearing that the stop was far too long to be constitutional. In Defendant's view, there was no reasonable suspicion that would justify prolonging the stop beyond the time it took to issue a warning or a ticket for the vehicle's expired registration. Defendant argued that possession of a weapon is not illegal in North Carolina; the fact that the firearm was concealed was due, in Defendant's own words, to the fact that it slipped between the seats, and thus, there was no reasonable suspicion to prolong the stop to investigate potential violation of the concealed carry statute. The Government's argument, on the other hand, suggested directly the opposite. In fact, the Government argued at the hearing that the traffic stop's length was irrelevant to the Court's consideration of the constitutionality of the search of the vehicle and seizure of the firearm. The Government argued at the hearing that the search was constitutional pursuant to the automobile exception to the warrant requirement such that once Officer Smith learned of the concealed weapon, he could search the car that Teasley was driving for evidence of the concealed carry violation. Furthermore, the traffic stop's length was supposedly irrelevant, from the Government's perspective, because Officer Smith had probable cause to arrest Defendant Teasley for violation of the concealed carry statute. The wide chasm between the Defendant's arguments and the Government's arguments will be explored further in the following analysis.

8

The Court's analysis will proceed through the various steps of the traffic stop. "Law enforcement personnel may [] stop a vehicle when they have probable cause to believe that a traffic violation has taken place." United States v. Douville, 1:21-CR-070-MR-WCM, 2022 WL 873515, at *5 (W.D.N.C. Feb. 16, 2022) (internal citations omitted). Here, Officer Smith testified that he learned upon arrival to the Mint Hill apartment complex that the silver Honda sedan which he observed in the parking lot and was investigating had an expired registration. Thus, upon the vehicle's entrance into the roadway from the parking lot, Officer Smith initiated a valid traffic stop based on the expired registration. See N.C. Gen. Stat. § 20-111(2) (stating that it is a misdemeanor to display an expired registration plate on a vehicle). It is irrelevant that Officer Smith was in Mint Hill to investigate a misdemeanor larceny from an ABC store – since he observed a traffic violation, the traffic stop of the car that Teasley was driving was justified.[3] See United States v. McCoy, 3:17-CR-240-MOC-DSC, 2018 WL 1144594, at *2 (W.D.N.C. Mar. 2, 2018) (citing Whren, 517 U.S. at 813) ("[t]he officer's subjective motivation in making the stop is unimportant; it only matters whether the basis for the stop was objectively reasonable").

Regarding Officer Smith's directive to Teasley to exit the vehicle so that Smith could perform a frisk of Teasley's person, that act is also in line with the Fourth Amendment. In order to protect officer safety, the Supreme Court has stated that it is constitutional for "an officer making a traffic stop [to] order passengers to get out of the car pending completion of the stop." Maryland v. Wilson, 519 U.S. 408, 415 (1997). Furthermore, a "brief pat down" of the driver may occur when the officer "harbor[s] reasonable suspicion that the person subjected to the frisk is armed and dangerous." United States v. Seabrooks, 3:17-CR-360-MOC-DSC, 2018 WL 2023132, at *4

---

[3] For this reason, Defendant's argument that Officer Smith was not "authorized to lawfully conduct a traffic stop to investigate or arrest a citizen based on a misdemeanor shoplifting offense" misses the mark. (Document No. 15, p. 6).

(W.D.N.C. May 1, 2018) (quoting Arizona v. Johnson, 555 U.S. 323, 326 (2009)). Thus, the undersigned concludes that there is no Fourth Amendment problem with Officer Smith ordering Defendant to exit the vehicle and to conduct a brief frisk of his person. The BWC video footage played at the hearing showed Officer Smith approaching Teasley's vehicle, asking him if he had any guns, and Defendant answering in the affirmative. At this point – out of a concern for his safety as a law enforcement officer – it was appropriate for Officer Smith to order Teasley to exit the vehicle and to frisk him to ensure that he was not armed.

Regarding the search of the vehicle, it is established that "an officer that learns of the presence of a firearm may search the vehicle to secure that weapon." United States v. Forney, 3:12-CR-381-FDW-DCK, 2013 WL 2317700, at *7 (W.D.N.C. May 28, 2013). This sort of "protective search" is justified in the precise circumstances present in this case, where Defendant "admi[tted] that a firearm was located in the vehicle." Id. at *10 (citing United States v. Goode, 178 F. App'x 219, 221 (4th Cir. 2006)). Moreover, the search here was justified precisely because "the defendant was unsecured and could still access the weapon." United States v. Graham, 686 F. App'x 166, 172, n.2 (4th Cir. 2017). At the time Officer Smith searched the car, he was aware because of Defendant's admission that there was a gun in the car, and Defendant was unrestrained standing behind Officer Smith during the search. The undersigned thus finds no constitutional issue with the search itself.

The closer, more difficult issue is whether the stop was unconstitutionally prolonged in violation of the Fourth Amendment. Defendant argues that the stop "was clearly unreasonable and [Officer Smith] exceeded the time needed to determine Mr. Teasley was not the shoplifting suspect [he] was seeking, nor was the scope of the stop consistent with a stop for an expired registration tag—which was *never addressed* during Mr. Teasley's seizure." (Document No. 15, p. 9). The

10

Government, by contrast, argued at the hearing that the traffic stop's length was irrelevant. Instead, the Government contends that Officer Smith had probable cause to arrest Teasley for violation of North Carolina's concealed carry statute, thus satisfying the requirement that in order to prolong a stop, an officer needs reasonable suspicion of criminal activity. See (Document No. 19, pp. 4-6) (citing N.C. Gen. Stat. §§ 14-269, 14-415.11(a); United States v. Branch, 537 F.3d 328, 336 (2008)). The Government, however, overlooks the complex web of case law concerning the constitutional duration of a traffic stop, ignoring some critical intricacies about this case that make it less clear-cut than the Government makes it out to be.

The undersigned finds that the key to resolution of this motion lies in the Supreme Court's directive that the officer may not "*prolong*[]" a traffic stop "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Rodriguez, 575 U.S. at 355 (emphasis added). In other words, the traffic stop's primary "mission" is "to address the traffic violation that warranted the stop." Id. at 354. Of course, where reasonable suspicion of criminal activity separate and apart from the traffic violation exists, the officer, as the Supreme Court instructs, may *prolong* or *extend* the stop – but not *usurp* the stop itself. Id. at 355. This is because any "[o]n-scene investigation into other crimes…detours from that [primary, traffic-related] mission." Id. at 356. Inherent in the Court's choice of words is a recognition that the primary purpose of the stop is to address the traffic infraction. See id. at 354 ("[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed"). For that reason, the Supreme Court's focus in analyzing cases involving traffic stop duration issues is upon whether "an officer can complete traffic-based inquiries expeditiously" and with diligence. Id. at 357; Caballes, 543 U.S. at 407 ("[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to

11

complete that mission"). As explored further below, the undersigned finds that Officer Smith's actions cannot be characterized as even *prolonging* the stop, for the traffic stop never even really started. One cannot prolong a task that one has not begun.

In other words, Officer Smith "definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation," and the investigation into Teasley's criminal history, specifically whether he possessed any felony convictions, "constituted the bulk of the interaction" between Officer Smith and Teasley. United States v. Digiovanni, 650 F.3d 498, 508-509 (4th Cir. 2011) (quoting United States v. Everett, 601 F.3d 484 (6th Cir. 2010)), *abrogated in part on other grounds* by Rodriguez, 575 U.S. 348. The investigation into the unrelated crime *was* the whole stop – in other words, there was no traffic mission to add time to as Rodriguez contemplates, because Officer Smith, as Defendant states, "never addressed" the expired registration issue. (Document No. 15, p. 9). In fact, although Officer Smith testified that he had his ticket pad with him on the relevant date, he did not write a ticket for the expired registration issue, notwithstanding that there was ample time during the forty-six minutes when the computer check of Teasley's criminal record was ongoing that he could have diligently pursued the mission of the stop.

This situation is unlike other cases that the undersigned has examined in the Fourth Circuit in which reasonable suspicion of unrelated criminal activity was sufficient justification to prolong the traffic stop. In those cases, officers at the least mentioned the reason for the stop, and initiated database checks to carry out the traffic-related mission of the stop. See United States v. Palmer, 820 F.3d 640, 645 (4th Cir. 2016); Forney, 2013 WL 2317700, at *1, *4. When intervening factors arose such that reasonable suspicion of other criminal activity was present, the Fourth Circuit and the district court, respectively, ultimately found that the officers were justified in

12

extending the traffic stops. Palmer, 820 F.3d at 653; Forney, 2013 WL 2317700, at *7. Here, unlike in Forney and Palmer, there was not a single mention of the expired registration, no attempt to write a ticket for the expired registration, and the criminal history check was run for the purpose, as Officer Smith testified at the hearing, of verifying Teasley's felony conviction history following seizure of the gun. Looking for a felony conviction in a criminal history check to potentially arrest someone for being a felon in possession of a firearm that lengthened a traffic stop to forty-six minutes is different in kind than the database checks in Forney and Palmer. See Forney, 2013 WL 2317700, at *4; Palmer, 820 F.3d at 645. In those cases, database checks were run as part of the normal traffic stop-related tasks immediately following brief conversations with the drivers of the stopped vehicles. See Rodriguez, 575 U.S. at 349 ("an officer's mission during a traffic stop typically includes checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance"). The database checks in those cases were not part of investigation into criminal activity separate and apart from the traffic violations themselves but rather were the kind of normal, "routine checks" that "allow[] an officer to complete his traffic mission safely." Palmer, 820 F.3d at 651.[4]

---

[4] The Government argued at the hearing that what Officer Smith was doing in running a criminal history computer check on Teasley was just part of the usual course of affairs that occurs during a traffic stop, and Officer Smith shouldn't be faulted for computer delays that were out of his control. Not so. The Fourth Circuit has explicitly stated that such "computer checks" are part of ensuring officer safety. See Palmer, 820 F.3d at 649. Here, Officer Smith's own actions and testimony directly negate any argument that taking forty-six minutes to run a criminal history check on Teasley was performed for personal safety reasons. Instead, what Officer Smith was doing was conducting investigation into a separate potential crime – being a felon in possession of a firearm – when he had not even yet started the traffic stop or made any attempt to diligently pursue the traffic stop's mission. Officer Smith allowed Teasley to stand unrestrained outside of his patrol vehicle, as the BWC footage shows, for some period of time while he conducted the computer search, and he also testified numerous times about how Teasley was "polite" and "cooperative." Such actions and words do not align with an argument that Officer Smith felt personally endangered, particularly not when the computer search and Teasley's lack of restraint endured for forty-six minutes. See United States v. Purcell, 236 F.3d 1274, 1279 (11th Cir. 2001) (recognizing that criminal records computer checks – even those conducted as ordinary incidents of a traffic stop – "might lengthen a traffic stop beyond what is reasonable in a particular case[, and a]fter a certain point, this might constitute an unreasonable detention").

The undersigned concludes that Officer Smith's actions to investigate a potential firearm-related crime went beyond a mere "detour" from the traffic mission, for in fact, almost from the outset, Officer Smith abandoned the purpose of the traffic stop. Rodriguez, 575 U.S. at 356. That complete abandonment of the mission of the traffic stop is not tolerated by the Fourth Amendment. For the reasons explained above, the undersigned will respectfully recommend that Defendant's motion be granted.[5] The undersigned therefore respectfully recommends that the firearm seized and Mr. Teasley's statements during the interaction with Officer Smith be suppressed. See Murray v. United States, 487 U.S. 533, 536 (1988) ("[t]he exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search…and of testimony concerning knowledge acquired during an unlawful search").

## V. CONCLUSION

This case is an instance in which a law enforcement officer definitively abandoned the purpose of the traffic stop itself, instead launching a wholly unrelated investigation into separate criminal activity. Importantly, the Fourth Circuit has stated that "[p]osessing probable cause that a driver has committed a traffic infraction does not give an officer free rein to keep the vehicle and its passengers on the side of the road while the officer investigates any hunch." United States v. Guijon-Ortiz, 660 F.3d 757, 770 (4th Cir. 2011). Indeed, the Fourth Amendment has a clear purpose of protecting citizens from unreasonable intrusions, as "[t]raffic stops are not hypothetical

---

[5] The constitutional error is thus more fundamental than the Government's arguments at the hearing and in its brief would lead the Court to believe. In the Government's view as discussed at the hearing, the length of the stop is "not relevant to the exclusionary rule." Presumably, the Government takes this view because it believes that Officer Smith possessed probable cause to investigate violation of the concealed carry statute in North Carolina. See (Document No. 19, pp. 6-7). The undersigned's analysis, however, concludes that the traffic stop was unconstitutional because the traffic stop never even started, nor did it ever resume, and there was no reasonable diligence to complete the mission of the stop. Regardless of whether Officer Smith possessed reasonable suspicion or probable cause to investigate a separate crime (an issue on which the undersigned takes no position), it is clear that the length of time that the stop lasted was unreasonable precisely because there was a total lack of diligence in pursuing the mission of the traffic stop for the expired registration (an issue about which Teasley was never even informed). Rodriguez permits *prolongation* of traffic stops when reasonable suspicion of separate criminal activity exists, not *complete usurpation* of the stop itself. 575 U.S. at 355.

14

imaginings; they are real world interferences with constitutional liberty, permissible only when they are constitutionally reasonable." Id.

## VI. RECOMMENDATION

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that Defendant's "Motion To Suppress Evidence Based On Fourth Amendment Violations" (Document No. 15) be **GRANTED**.

## VII. TIME FOR OBJECTIONS

The parties are hereby advised that pursuant to 28 U.S.C. § 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact, conclusions of law, and recommendation contained herein may be filed within **fourteen (14) days** of service of same. Responses to objections may be filed within fourteen (14) days after service of the objections. Fed.R.Civ.P. 72(b)(2). Failure to file objections to this Memorandum and Recommendation with the District Court constitutes a waiver of the right to *de novo* review by the District Court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005); United States v. Benton, 523 F.3d 424, 428 (4th Cir. 2008). Moreover, failure to file timely objections will preclude the parties from raising such objections on appeal. Id. "In order 'to preserve for appeal an issue in a magistrate judge's report, a party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.'" Martin v. Duffy, 858 F.3d 239, 245 (4th Cir. 2017) (quoting United States v. Midgette, 478 F.3d 616, 622 (4th Cir. 2007)).

**IT IS SO RECOMMENDED**.

Signed: January 20, 2023

David C. Keesler
United States Magistrate Judge